# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| OZARKS COCA-COLA/DR. PEPPER BOTTLING CO., et al., | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| vs. | ) Case No. 06-03056-CV-W-GAF<br>)<br>) |
| THE COCA-COLA COMPANY and COCA-COLA ENTERPRISES, INC., | )<br>)<br>) |
| Defendants. | ) |

## ORDER

Presently before the Court are two Motions to Transfer Venue filed by Defendants, The Coca-Cola Company, Inc. ("TCCC") and Coca-Cola Enterprises, Inc. ("CCE") (collectively "Defendants").[1] (Docs. #22, #28). Defendants argue that, under 28 U.S.C. § 1404(a) ("§ 1404(a)"), this Court should transfer venue to the United States District Court for the Northern District of Georgia, Atlanta Division because considerations of convenience and judicial economy warrant transfer. Id. Plaintiffs, Ozarks Coca-Cola/Dr. Pepper Bottling Co., et al. (collectively "Plaintiffs"), oppose Defendants' Motions, arguing that Defendants have not demonstrated that a transfer of venue is required for the convenience of the parties and witnesses, or that any other considerations justify transferring venue. (Doc. #67-1). After carefully considering the arguments presented by the parties, Defendants' Motions to Transfer Venue are GRANTED.

---

[1] Although TCCC and CCE filed separate Motions, in light of the similarity of the arguments presented, the Court rules on both Motions in the present Order.

**DISCUSSION**

**I.      Facts**

The Plaintiffs in this case are fifty-five soft drink bottling companies who bottle and distribute Coca-Cola products. (Doc. #34). This case arises from separate contracts that Defendant CCE and each Plaintiff entered into with TCCC to market and distribute PowerAde in exclusive geographic areas.[2] Id. The foundation of the Coca-Cola bottling system is that bottling companies such as the Plaintiffs have the exclusive and perpetual right to bottle and distribute Coca-Cola products in their respective territories. Id. Historically, bottlers have always been responsible for all aspects of the local production, warehousing, distribution, and sale of these products. Id.

The method bottlers such as the Plaintiffs use to distribute Coca-Cola products is called Direct Store Delivery ("DSD"). Id. DSD permits the bottler to determine how Coca-Cola products are priced, marketed, and sold in the bottler's exclusive territory–the bottler is responsible for the supply, placement, and marketing of Coca-Cola products at the point-of-sale to the ultimate consumer. Id. The bottler negotiates for the maximum amount of shelf space for its products in retail outlets, and the bottler delivers the products directly to the shelves of the retail outlets. Id. Bottlers are responsible for stock rotation, removing and destroying out-of-date products at the bottler's expense, advertising, building displays, and demand fulfillment within each bottler's exclusive territory. Id. The Plaintiffs contend that the DSD system is at the core of the successful marketing of TCCC's products, brand awareness, and customer preference for those products. Id.

---

[2]CCE's and each Plaintiff's PowerAde contract are substantively identical.

Plaintiffs claim that TCCC and the bottlers have never opted to use a system of distributing Coca-Cola products known as "Warehouse Delivery." Id. Warehouse Delivery is where the product is simply delivered to a retail store's warehouse or made available for pickup. Id. The Plaintiffs claim that employing a system of Warehouse Delivery would result in shifts in marketing and distribution relationships in that the retailers would replace the bottlers in all aspects of product placement, brand image, and market penetration. Id. The Plaintiffs further claim that Warehouse Delivery would be a direct threat to the exclusivity of each bottler's territory. Id. For example, the Plaintiffs allege that a particular grocery store chain might have a central warehouse, but the delivery territory of that warehouse may not coincide with the exclusive territory of a particular bottler. Id.

Defendant CCE is the largest distributor of Coca-Cola products in the world. Id. Plaintiffs allege that, for all practical purposes, TCCC controls CCE. Id. Plaintiffs claim that, although CCE's PowerAde contract with TCCC prohibits Warehouse Delivery, CCE secretly conspired with TCCC to initiate testing of a system to Warehouse Deliver PowerAde to Wal-Mart. Id. This alleged conspiracy is embodied in a document known as the "Coca-Cola Call Plan," which the Plaintiffs claim was inadvertently posted on CCE's internet website. Id. While working at his Springfield, Missouri office, an executive for Plaintiff Ozarks Coca-Cola/Dr. Pepper Bottling Company ("Ozarks") allegedly discovered the "Coca-Cola Call Plan" on CCE's website. Id. Plaintiffs contend that CCE must deliver PowerAde to individual Wal-Mart stores, as Plaintiffs do, instead of delivering PowerAde to Wal-Mart warehouses, as CCE intends to do.[3]

---

[3] In Counts I through III of the Amended Complaint, Plaintiffs seek relief from TCCC for an alleged breach of each of their respective PowerAde contracts, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. In Counts IV through VII, Plaintiffs seek relief from CCE for an alleged breach of contract, breach of fiduciary duty, breach of agency relationship and

3

Id. TCCC and CCE contend that the terms of CCE's PowerAde contract permit it to use "Warehouse Delivery" in its own exclusive territory. (Doc. #29-1).

In the instant Motions, Defendants argue that the parties have very little connection to the Western District of Missouri and that the case should therefore be transferred to the Northern District of Georgia. (Doc. #23-1, #29-1). TCCC is a Delaware corporation with its headquarters and principal place of business in Atlanta, Georgia. (Doc. #34). CCE is also a Delaware corporation with its principal place of business in the Northern District of Georgia. Id. Four of the Plaintiffs reside in Missouri. Id. The remaining fifty-one Plaintiffs operate in various jurisdictions across the country, from Maine to California. Id. However, Plaintiffs note that eighteen Plaintiffs reside in states adjoining Missouri. (Doc. #67-1).

Defendants argue that a transfer of venue to the Northern District of Georgia would serve the convenience of the witnesses and the parties, as well as the interests of justice, because Plaintiffs all have significant ties to the Northern District of Georgia and the events giving rise to this suit primarily occurred in the Northern District of Georgia. (Doc. #23-1, #29-1). For example, Plaintiffs' PowerAde contracts are expressly governed by Georgia law, which is where the contracts were negotiated and where TCCC executed each of them. (Doc. #34, Exh. #1). Additionally, the "Coca-Cola Call Plan," and Warehouse Delivery proposal to Wal-Mart were drafted in Atlanta. (Shotts Decl. ¶ 4). Moreover, Plaintiffs are all members of the Coca-Cola Bottlers Association ("CCBA"), a trade organization that purports to represent

---

tortious interference. In Count VIII, Plaintiffs allege that TCCC and CCE conspired to breach each Plaintiff's PowerAde contract. Count IX seeks a preliminary and permanent injunction prohibiting TCCC and CCE from, *inter alia*, "encouraging, facilitating or participating in any plan to warehouse deliver Powerade [sic], directly or indirectly, to any customer." Count X seeks attorney fees pursuant to the Georgia Code.

4

and advocate for the PowerAde distributors' interests. (Doc. #34). In the discussions among the parties that led to this lawsuit, CCBA represented the PowerAde distributors in negotiations with TCCC. (Wood Decl. ¶ 15). CCBA is organized under the laws of Georgia and maintains its headquarters and principal place of business in Atlanta. (Purcell Decl. ¶ 2). CCBA's current executive director resides in Atlanta. (Wood Decl. at ¶ 7).

Defendants further argue that venue should be transferred to the Northern District of Georgia because various employees and former employees of Coca-Cola with allegedly relevant information reside in Atlanta. (Docs. #34, 29-1). These include many of the individuals specifically named in Plaintiffs' complaint, such as: John Culhane ("Culhane"), former General Counsel of Coca-Cola USA and current General Counsel of CCE; L.D. Coddon ("Coddon"), who represented TCCC with respect to the PowerAde contracts; and J.A.M Douglas, Jr. ("Douglas"), former Senior Vice President of TCCC. Id. Plaintiffs also claim that William Hames ("Hames"), outside counsel for CCE, was copied on certain correspondence from Coddon. (Doc. #34). Hames resides in Atlanta. (Doc. #23-1).

Plaintiffs further claim that James Wardlaw ("Wardlaw"), a representative of CCE, sat on CCBA's Board of Directors at the time of the approval of the PowerAde contracts. (Doc. #34). At that time, Wardlaw resided in Atlanta, and presently resides in Chattanooga, Tennessee. (Doc. #23-1). Arthur Gregory ("Gregory"), Executive Director of the CCBA, allegedly engaged in communications with TCCC regarding warehouse delivery of PowerAde. (Doc. #34). Gregory maintains a residence in Atlanta. (Wood Decl. ¶ 16). Plaintiffs claim that Charles Wallace ("Wallace") was TCCC's representative in discussions relating to the PowerAde contracts. (Doc. #34). At that time, Wallace resided in Atlanta, and he presently resides in South Carolina. (Doc. #23-1). Plaintiffs also allege that John Kayajan ("Kayajan"),

5

the former President of the CCBA, was involved in discussions relating to the PowerAde contracts. (Doc. #34). Kayajan was involved in those discussions in Atlanta and does not reside in the Western District of Missouri. (Doc. #23-1).

In addition, the "Coca-Cola Call Plan" identifies an additional ten witnesses, none of whom reside in the Western District of Missouri. Stennis Shotts ("Shotts"), the CCE "Team Lead," resides in Atlanta and Todd Smith ("Smith"), the "CCNA Marketing Expert," works in Atlanta. (Shotts Decl. ¶ 1; Wood Decl. ¶ 21). Steve Broughton ("Broughton"), Jill Elias ("Elias"), and John Westling ("Westling") are Wal-Mart employees and currently reside in Bentonville, Arkansas. (Shotts Decl. ¶ 2). Ed Ray ("Ray"), Sharon Belto ("Belto"), Bill Ryan ("Ryan"), and Paul Kraus ("Kraus") are CCE employees and Jeff McClelland ("McClelland") is a Coca-Cola North America employee; all currently reside or work in Bentonville. (Shotts Decl. ¶ 2; Wood Decl. ¶ 22).

Plaintiffs argue that Defendants have not demonstrated that a transfer of venue to the Northern District of Georgia will serve the convenience of the parties and the witnesses as well as the interests of justice. (Doc. #67-1). Plaintiffs point out that, because the existence of the "Coca-Cola Call Plan" was discovered by an Ozarks executive in Missouri, this case is connected to the Western District of Missouri. (Doc. #67-1). Plaintiffs further note that at least four potential witnesses, all employees of Ozarks, are located in Missouri.[4] Id. Additionally, Plaintiffs argue that their choice of forum is entitled to substantial weight and should not be disturbed absent a clear and convincing showing by Defendants that a transfer of venue is warranted in this case. Id.

---

[4] Plaintiffs do not state where any of the other fifty-one Plaintiffs' witnesses are located.

6

## II. Legal Standard and Analysis

Section 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[5] 28 U.S.C. § 1404(a); Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 691 (8th Cir. 1997). By enacting § 1404(a), Congress "intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). (internal citations omitted).

The party seeking transfer under § 1404(a) has the burden of proof, and must make a convincing showing of the right to transfer. *See* Anheuser-Busch, Inc. v. City Merchandise, 176 F.Supp. 2d 951, 959 (E.D. Mo. 2001). A plaintiff's choice of forum is generally "entitled to great weight and will not be lightly disturbed." Houk v. Kimberly-Clark Corp., 613 F.Supp. 923, 928 (W.D. Mo. 1985). However, courts afford a plaintiff's choice of forum "significantly less deference when (1) [the] plaintiff does not reside in the selected forum or (2) the transaction or underlying facts did not occur in the chosen forum." Nelson v. Soo Line R. Co., 58 F.Supp.2d 1023, 1026 (D. Minn. 1999).

Among the relevant considerations for this Court in determining whether transfer is appropriate in this case are: (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the availability of the judicial process to compel the attendance of unwilling witnesses; (4) governing law; (5) the relative

---

[5]The parties do not dispute that the action originally "might have been brought" in the Northern District of Georgia. Accordingly, the Court will only address § 1404(a)'s requirement that the transfer be "for the convenience of the parties and witnesses" and "in the interest of justice."

7

ease of access to sources of proof, (6) the possibility of delay and prejudice if the transfer is granted, and (7) practical considerations indicating where the case can be tried more expeditiously and inexpensively. Houk, 613 F.Supp. at 927. (internal citations omitted).

*A. Convenience of Witnesses*

The convenience of witnesses is the most important factor in deciding a motion to transfer. Harrison v. Union Pac. R.R. Co., 45 F.Supp. 2d 680, 684 (E.D. Mo. 1999); *see also* Biometics, LLC v. New Womyn, Inc., 112 F.Supp. 2d 869, 876 (E.D. Mo. 2000). This factor involves consideration of the number of witnesses located in or near the respective forums, as well as "the nature and quality of their testimony" relative to the issues in the case. Midwest Mech. Contractor's Inc. v. Tampa Constructors, Inc., 659 F.Supp. 526, 532 (W.D. Mo. 1987); Houk 613 F.Supp. 923, 928 (W.D. Mo. 1985).

Many individuals with relevant knowledge of the issues identified in the complaint either reside in Atlanta or work for one of the Atlanta-based Defendants. The complaint identifies eight individuals by name who were involved in the negotiation or implementation of the PowerAde contracts and discussions relating to Warehouse Delivery: Wallace, Kayajan, Coddon, Culhane, Wardlaw, Gregory, Hames, and Douglas. Five of these individuals reside in Atlanta. Further, the "Coca-Cola Call Plan" identifies two witnesses who either work or live in Atlanta, and five more witnesses who live in Arkansas but are employees of the Atlanta-based Defendants.

Further, although the Plaintiffs point out that four Ozarks employees who may be called as witnesses reside in the Western District of Missouri, the relevant witnesses for the other fifty-one Plaintiffs who reside outside Missouri will presumably need to travel to the forum for hearings and trial, whether that

forum is the Western District of Missouri or the Northern District of Georgia. Accordingly, the convenience of the witnesses weighs heavily in favor of transfer to the Northern District of Georgia.

*B. Convenience of the Parties*

Defendants argue that litigating this case in the Northern District of Georgia will be more convenient for Defendants and for many of the Plaintiffs. (Doc. #23-1, #29-1). In addition to the fact that Defendants are based in Atlanta, Defendants point out that many of Defendants' key witnesses, former employees, and relevant documents are located in the Northern District of Georgia, while none of the Defendants' witnesses or relevant documents are located in the Western District of Missouri. Id.

Defendants also assert that the majority of the Plaintiffs could participate more conveniently in the Northern District of Georgia as well. Id. Plaintiffs argue that the Defendants have no basis for contending that they know what is best for the Plaintiffs and that this Court should not second-guess the Plaintiffs' litigation decisions. (Doc. #67-1). However, fifty-one of the fifty-five Plaintiffs do not conduct business in or have a relationship to the Western District of Missouri. Conversely, each Plaintiff has had a continual, long-term connection to the Northern District of Georgia through its relationship with TCCC. Further, each Plaintiff belongs to the CCBA, which is headquartered in Atlanta. This dispute bears very little connection to the Western District of Missouri, while all parties have a significant relationship with the Northern District of Georgia. Accordingly, the convenience of the parties strongly favors transfer to the Northern District of Georgia.

*C. Availability of the Judicial Process to Compel Attendance of Unwilling Witnesses*

None of the witnesses named in the complaint reside in the Western District of Missouri. Plaintiffs indicate that four employees of Ozarks may be called at trial. (Doc. #67-1). However, Plaintiffs do not

9

allege that these witnesses would be unwilling to testify in this case. Because many of the potential witnesses reside in the Northern District of Georgia, the Northern District of Georgia court is most likely in the best position to compel relevant witnesses to attend hearings and trial.

### *D. Governing Law*

"[I]t is in the interest of justice to transfer [an] action to a judge familiar with the law that will control the outcome of the case." Leverage Leasing Corp. v. Lincoln Ins. Co., 1991 WL 626752, at *3 (W.D. Mo. Sept. 27, 1991). Georgia law applies to the interpretation and enforcement of the Plaintiffs' PowerAde contracts. (Doc. #34, Exh. #3); *See* Northwest Airlines, Inc. v. Astrae Aviation Servs., Inc., 111 F.3d 1386 (8th Cir. 1997); Highwood Props., Inc. v. Exec. Risk Indem., Inc., 407 F.3d 917, 920 (8th Cir. 2005). Additionally, Plaintiffs filed a claim seeking attorney's fees and litigation expenses under Georgia's abusive litigation statute. (Doc. #34). Accordingly, the application of Georgia law to the various claims in this action is another factor favoring transfer to the Northern District of Georgia.

### *E. Relative Ease of Access to Sources of Proof*

The location of documents, while relevant to the Court's analysis under § 1404(a), is not entitled to great weight. Midwest Mechanical, 659 F.Supp. at 534. This factor is not entitled to great weight because "documents can easily be photocopied and transported from their place of storage." Houk, 613 F.Supp. at 932. Plaintiffs claim that many of the relevant documents are located in Bentonville, Arkansas, which is approximately a two hour drive from this district. Defendants allege that the vast majority of documents in their possession relevant to the negotiations and execution of the PowerAde contracts, CCE's management of certain national accounts, and the development and implementation of the warehouse delivery proposal with Wal-Mart are located in Atlanta. (Doc. #23-1, #29-1). Defendants are not aware

10

of any relevant documents in their possession which are located in the Western District of Missouri. Id. In addition, the CCBA likely maintains the majority of its documents relevant to this litigation in Atlanta. Finally, it is highly likely that the documents of fifty-one of the Plaintiffs are not located in the Western District of Missouri. Therefore, this factor weighs in favor of transfer as well.

### F. Delay or Prejudice to Plaintiffs

A transfer of this action would not cause significant delay or prejudice to Plaintiffs. This action was filed on February 14, 2006, approximately one month ago. Plaintiffs allege that because this Court has scheduled a preliminary injunction hearing in this matter for March 29 and 30, 2006, Plaintiffs would suffer significant prejudice if this case is transferred to the Northern District of Georgia. However, the Plaintiffs still have ample time to schedule a preliminary injunction hearing in the Northern District of Georgia. Merely scheduling the preliminary injunction hearing in the Northern District of Georgia will not give rise to new issues or create a need for additional preparation time. Accordingly, this factor does not militate against transfer.

## CONCLUSION

The Defendants have clearly demonstrated that all of the relevant factors favor transfer to the Northern District of Georgia. The Court finds that this action will proceed more expeditiously and conveniently in the Northern District of Georgia because of the presence in that district of TCCC, CCE, the CCBA, many of the witnesses, much of the relevant documentation, and because of the Georgia court's thorough understanding of Georgia law. Accordingly, Defendants' Motions to Transfer Venue to the Northern District of Georgia are GRANTED.

**IT IS SO ORDERED.**

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED:   March 17, 2006